IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>CALLEN JOSEPH BRADFORD,<br><br>Defendant. | CR 23–49–M–DWM<br><br><br>OPINION<br>and ORDER |

Defendant Callen Joseph Bradford is charged with possession with intent to distribute methamphetamine in violation of 21 U.S.C. § 841(a)(1). (Doc. 1.) The charges arise out of a traffic stop that occurred on October 22, 2021, in Lake County, Montana. (*See id.*) Bradford seeks to suppress the one pound of methamphetamine seized from the search of his vehicle on the basis that the stop was unconstitutionally extended and/or that the ensuing probationary search was unlawful. (*See* Docs. 23, 24.) A suppression hearing was held on January 18, 2024. The government called two witnesses, Polson Probation and Parole Officer Lori Thibodeau and Confederated Salish and Kootenai Tribal Officer Casey Couture. Based on the testimony, evidence, and argument presented at that hearing and the parties' written submissions, Bradford's motion is denied.

1

## BACKGROUND

The factual background is taken from the hearing testimony of Officers Thibodeau and Couture, as well as the law enforcement incident reports written by Couture and Lake County Sheriff Detective Scott Sciaretta. (*See* Docs. 24-1, 24-2.) Information is also taken from Couture's and Sciaretta's bodycam footage, although neither officer captured the entire interaction.[1]

At about 4:00 p.m. on October 22, 2021, Couture was patrolling northbound on Highway 93 near Pablo, Montana, on the Flathead Indian Reservation. When Couture passed Bradford, who was driving a blue Ford Expedition with Washington plates, Couture said that Bradford "look[ed] at me, . . . [his] eyes opened wide and [he] quickly sat up straight in the driver seat." (Doc. 24-2 at 2.) Couture ran the Ford's plates through tribal dispatch and learned that the registration was expired. Because he believed there was more than one person in the vehicle, Couture contacted Sciaretta, who agreed to assist with a traffic stop. Couture slowed below the posted speed limit to get behind Bradford but Bradford

---

[1] Couture's bodycam starts once Bradford is already out of the vehicle, right before the officers request permission to search. The footage then ends during the officers' conversation with the passengers. At the hearing, Couture explained that he failed to activate his camera when he first tried to do so and only realized his error when he noticed the red light was not blinking. While Sciaretta's bodycam begins to run prior to the initial stop, it cuts out well before the stop ends. Citations to the bodycam footage indicate which officer it came from and the playback time.

did not overtake him. Couture therefore turned into a parking lot off the highway to allow Bradford to go by. Couture was then able to turn out behind Bradford and initiate the stop.

Bradford stopped without issue, and Couture approached the passenger side of the vehicle, observing a female front passenger and a male driver. There was an additional female passenger in the back. Couture took Bradford's information and went back to his cruiser to run it through dispatch. While waiting for that "return," Couture ran Bradford through the Montana Correctional Offender Network and discovered that he was on parole out of Great Falls. Believing that individuals on parole need a travel pass to leave their authorized area within the state, Couture returned to the vehicle and asked Bradford for his travel pass. Bradford said he did not have one and that he was not aware he needed one. At this point, Couture asked Bradford to exit the vehicle. (Sciaretta 3:38.) Upon further questioning, Bradford stated that he was being supervised out of Great Falls after doing approximately three years in state custody for a partner-family member assault conviction. (Sciaretta 4:02.) Sciaretta then asked Bradford if there was anything in the vehicle because they were "going to talk to probation and parole" and "they are going to say search." (Sciaretta 5:36.) Bradford told Sciaretta that there was nothing in the vehicle. (Sciaretta 5:36.) At this point, Couture doublechecked with Sciaretta if he should reach out to state probation, and Sciaretta confirmed that he

3

should. (Sciaretta 6:40.) While Couture returned to his vehicle, Sciaretta briefly chatted with Bradford before returning to Bradford's vehicle to speak to the passengers. (Sciaretta 7:01 to 10:00.) Couture testified at the hearing that, at this point, Bradford was not free to leave.

Approximately three minutes later, Couture read Bradford's identification information over the phone, ostensibly to Officer Thibodeau with state probation. (Sciaretta 10:30.) Couture also asked Bradford what they were doing in the area, and Bradford explained that they were driving a loop from Great Falls to Glacier. (Sciaretta 10:40.) Couture relayed this information over the phone to Thibodeau. (Sciaretta 10:40.) About a minute later, Couture's bodycam footage begins with him saying, "It's a girl."[2] (Sciaretta 11:49; Couture 0:01.) Couture then asked Bradford if he would "mind" if they checked the vehicle, and Bradford said, "Yeah, go ahead." (Sciaretta 11:55; Couture 00:24.) Bradford volunteered that the vehicle was not his but he was responsible for "everything" in it. (Couture 00:38.)

At this point, Sciaretta asked the passengers to get out, and he searched the front passenger area. (Sciaretta 12:05.) Sciaretta found a glass pipe in a cigarette pack in front of the center console. (Sciaretta 13:00.) When Sciaretta asked who would claim the pipe, Bradford said that the vehicle was not his and, when

---

[2] Couture clarified at the hearing that this was in response to Thibodeau asking who was in the vehicle with Bradford.

4

Sciaretta told Bradford he was in "possession" of it, Bradford said, "Take me to jail." (Sciaretta 13:29; Couture 2:01.) Moments later, Bradford asserted that he did not give permission to search the vehicle and, in response, Sciaretta said that it "doesn't matter, the parole officer did." (Sciaretta 13:34.) Couture affirmed that "she said go ahead and search." (Couture 2:06.) After that, Bradford said that he would take the "blame" for the pipe and that he was an addict. (Couture 2:25.) The hearing testimony clarified that while Couture received authority to search the vehicle from Thibodeau prior to asking Bradford for his consent, it is Couture's general practice to see if a suspect will consent to search in the first instance. Thus, Couture asked Bradford for permission even though he had already gotten search authority from Thibodeau.

Sciaretta returned to the front passenger seat and looked through another cigarette pack before stopping his search, walking to the back of the vehicle, and telling Bradford that the vehicle was going to be seized. (Sciaretta 14:04.) Bradford was handcuffed, (Sciaretta 14:16; Couture 2:40), and taken to Couture's cruiser, (Couture 3:00). Bradford then repeatedly asked to speak to Sciaretta, saying that he wanted to "do the right thing." (Couture 3:29.) Sciaretta's bodycam footage ends with him telling the two female passengers that they can remove their belonging from the vehicle as long as he can search them first. (Sciaretta 14:42.)

The remainder of Couture's body cam footage is of his discussion with the passengers and does not bear on the present motion.

According to the officers' reports, however, Sciaretta went to Couture's cruiser to talk to Bradford. According to Sciaretta, Bradford said that he was "ready to do the right thing" and "cooperate." (Doc. 24-1 at 5.) Bradford stated that he did not want to return to prison but that he was involved with people on the "front" and was supposed to meet up with them in a week or so to get both "dark" and "clear." (*Id.*) According to Sciaretta, Bradford further stated that he could get "pounds." (*Id.*) Sciaretta then *Mirandized* Bradford, and Bradford told Sciaretta that he had a pound of methamphetamine in his coat in the vehicle. (*Id.*) Sciaretta did not locate any drugs in the coat but discovered the methamphetamine had fallen out onto the floor behind the driver's seat. (*Id.*)

## ANALYSIS

"The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Willis*, 431 F.3d 709, 714 (9th Cir. 2005) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). Consistently, warrantless searches and seizures are presumed to be unreasonable unless they fall within "a few specifically established and well-delineated exceptions." *United States v. Scott*, 705 F.3d 410, 416 (9th Cir. 2012).

6

"The government bears the burden of justifying a warrantless search." *United States v. Johnson*, 936 F.2d 1082, 1084 (9th Cir. 1991).

Although Bradford does not challenge the basis for the initial stop, he insists that his continued detention and the ultimate search of his vehicle exceeded constitutional parameters. In response, the government argues that the officers had independent reasonable suspicion to continue the stop and to search the vehicle based on Bradford's consent and potential parole violations. While the facts of this case present close questions as to both the legality of the extension of the stop and the ultimate search of Bradford's vehicle, the government has met its burden here. Bradford's motion is therefore denied.

## I.  Duration and Extension of Traffic Stop

Police officers may conduct a traffic stop when they have reasonable suspicion to believe that a motorist has committed a traffic violation. *Kansas v. Glover*, 589 U.S. ___, 140 S. Ct. 1183, 1187–88 (2020); *see United States v. Lopez-Soto*, 205 F.3d 1101, 1105 (9th Cir. 2000) ("[T]he Fourth Amendment requires only reasonable suspicion in the context of investigative traffic stops."). "Reasonable suspicion is formed by specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity." *Lopez-Soto*, 205 F.3d at 1105 (internal quotation marks omitted). "An officer is entitled to rely on his

7

training and experience in drawing inferences from the facts he observes, but those inferences must also be grounded in objective facts and capable of rational explanation." *Id.* (internal quotation marks omitted). If "officers have probable cause to believe that a traffic violation has occurred, the officers may conduct a traffic stop even if the stop serves some other purpose." *Willis*, 431 F.3d at 715.

Here, there is no dispute that the initial stop was valid because Bradford's vehicle had an expired registration. *See* Mont. Code Ann. § 61–3–301(1)(a) (requiring proper registration); *United States v. Diaz-Castaneda*, 494 F.3d 1146, 1152 (9th Cir. 2007) ("[W]hen police officers see a license plate in plain view, and then use that plate to access additional non-private information about the car and its owner, they do not conduct a Fourth Amendment search."); *see also Whren v. United States*, 517 U.S. 806, 810 (1996) ("As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."). Bradford argues, however, that the officers unlawfully prolonged the stop once they determined he was on parole in order to obtain his parole officer's authorization to search the vehicle.

"[A] police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." *Rodriguez v. United States*, 575 U.S. 348, 350 (2015). In *Rodriguez*, for example, police lawfully stopped a driver for briefly veering onto the shoulder of

the road. *Id.* at 351. After writing a warning and explaining it to the driver, returning the driver's and passenger's documents, and reaching the point where all the reasons for the stop were "out of the way," the officer instructed the driver to turn the car off and conducted a dog sniff. *Id.* at 351–52. The Court held that the dog sniff—although it added only 7 to 10 minutes to the stop—unreasonably extended the stop because it "'prolonged [the seizure] beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation." *Id.* at 350, 353, 357 (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). Officers cannot simply extend a stop so long as the circumstances are "reasonable" but rather "a traffic stop may be extended to conduct an investigation into matters other than the original traffic violation only if officers have reasonable suspicion of an independent offense." *United States v. Landeros*, 913 F.3d 862, 867 (9th Cir. 2019). The order of events is irrelevant: "[w]hat matter[s] was the added time, not at what point, in the chronology of the stop, that time was added." *Id.* at 866.

Accordingly, the officers here were permitted to ask Bradford for his driver's license and inquire about the vehicle's registration. Any further inquiry, however, "was permissible only if it was (1) part of the stop's 'mission' or (2) supported by independent reasonable suspicion." *Id.* at 868.

### A. "Mission" of the Stop

"When stopping an individual for a minor traffic violation, an officer's mission includes ordinary inquiries incident to the traffic stop." *Id.* (internal quotation marks omitted). "These involve 'checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance,' and each shares 'the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly.'" *Id.* (quoting *Rodriguez*, 575 U.S. at 349). While an officer may "conduct unrelated checks during an otherwise lawful traffic stop," "he may not do so in a way that prolongs the stop, absent" reasonable suspicion. *Rodriguez*, 575 U.S. at 355. "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* at 354. As it relates to the specific facts here, while officers can run a records check on a driver, asking a driver his parole or probation status is generally considered "wholly unrelated" to the traffic stop, falling outside its original mission. *See United States v. Mati*, 466 F. Supp. 3d 1046, 1055–56 (N.D. Cal. 2020) (collecting cases).

Here, Couture made contact with Bradford and then returned to his police cruiser to run Bradford's information through dispatch. While Couture was waiting for the "return" of that information, he ran Bradford through Montana's

10

ConWeb system and discovered that Bradford was on parole. Bradford's parole status was therefore discovered before Couture had completed the ordinary tasks tied to a traffic stop. Thus, this limited action did not unlawfully extend the stop. *See United States v. Glass*, 833 F. App'x 149, 150–51 (9th Cir. 2021) (holding that officers' probation/parole check of suspect did not "measurably extend[] the duration" of the otherwise lawful seizure); *United States v. Simon*, 2022 WL 797016, at *4 (N.D. Cal. Mar. 16, 2022) (same). Nevertheless, the stop was clearly extended once the officers became aware of Bradford's parole status, asked Bradford to exit his car, and sought to contact the state probation office; actions going beyond the "mission" and duration of the initial traffic stop.

## B.  Independent Reasonable Suspicion

The extension of the stop was therefore unconstitutional unless it was supported by independent reasonable suspicion. *Landeros*, 913 F.3d at 868. "[R]easonable suspicion must be individualized," *Thomas v. Dillard*, 818 F.3d 864, 877 (9th Cir. 2016), and an officer "must be able to articulate more than an inchoate and unparticularized suspicion or hunch of criminal activity," *Illinois v. Wardlaw*, 528 U.S. 119, 123–24 (2000) (internal quotation marks omitted). Reasonable suspicion is an objective inquiry assessed under a "totality of the circumstances." *United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013).

11

Here, the government argues that once the officers learned of Bradford's parole status, the "focus for the traffic stop shifted to include an investigation of potential parole violations." (Doc. 26 at 10.) Specifically, the government argues that the extension is based on the fact that Bradford (1) "was operating a motor vehicle with an expired registration" and (2) "was on supervision out of Cascade County and was in Lake County without a travel permit." (*Id.*) The government is indeed correct that the basis for the stop lawfully evolved once the officers became aware of Bradford's parole status. The conditions of Bradford's parole state that he "shall comply with all city, county, state, and federal laws and ordinances," and "will not leave [his] assigned district without first obtaining written permission from a Probation/Parole Officer."[3] (Doc. 26-2 at 1.) Under Montana law, a parolee may be arrested without a warrant if, "in the judgment of the probation and parole officer, [the parolee] violated the conditions of the parolee's release." *See* Mont. Code Ann. § 46–23–1023(2). Thus, contrary to Bradford's position, there are specific and articulable facts here that give rise to a reasonable suspicion that Bradford was in violation of specific parole conditions, justifying the short delay associated with the officers contacting the state probation office to confirm or

---

[3] Even if the officers were not aware of Bradford's specific conditions at the time of the stop, they had reasonable suspicion to believe that, as a parolee, Bradford was subject to substantially similar conditions of probation and parole as outlined in the Administrative Rules of Montana. *See* Admin. R. Mont. 20.7.1101.

12

dispel their suspicion. *See United States v. Swain*, 855 F. App'x 392, 393 (9th Cir. 2021) (upholding the legality of continued detention and search where the officer learned the driver was on probation and had a revoked license).

That said, Bradford makes a good point that this case is a bit unique in that there are no other facts in the record indicative of criminal conduct that would otherwise support the extended seizure that occurred here. Indeed, Couture testified multiple times that the two potential parole violations identified above were the only basis for continuing the initial stop. Couture also testified that it is his "practice" to contact probation and parole once he learns that a suspect is being supervised and to let the probation and parole officer determine whether Couture should initiate a search or arrest. The fact that this is the officer's regular "practice" undermines the idea that his decisions in this case were guided by reasonable suspicion. *Cf. United States v. Taylor*, 634 F. Supp. 3d 690, 701, 703 (N.D. Cal. 2022) ("In fact, as his matter of practice, the question concerning probation and parole is asked without consideration of reasonable suspicion."). As is the fact that Couture actually asked Sciaretta whether they should even contact the parole office. (*See* Sciaretta 6:40.)

Nevertheless, reasonable suspicion is assessed on the objective facts known by the officers at the time. *Valdes-Vega*, 738 F.3d at 1078. Here, the officers knew that Bradford was on parole and had reasonable suspicion that he had

violated the terms of that parole. Thus, the extension of the traffic stop to contact the state parole office did not exceed the parameters of the Fourth Amendment.

## II. Search

Having determined that the officers did not unlawfully prolong the stop, the next question is whether the ensuing search of the vehicle passes constitutional muster. The government argues that the search was lawful for two reasons: (1) it was authorized by state probation and parole consistent with Bradford's parole conditions and (2) Bradford consented. Because the latter argument is persuasive, Bradford's motion is denied.

Voluntariness is a question of fact determined from the totality of the circumstances. *Schneckloth v. Butsamonte*, 412 U.S. 218, 227, 248–49 (1973). Prior to informing Bradford that he had received authorization to search the vehicle from probation and parole, Couture asked Bradford if he would "mind" if they checked the vehicle, and Bradford said, "Yeah, go ahead." (Sciaretta 11:55; Couture 00:24.) Immediately thereafter, Sciaretta discovered a glass pipe in the middle console area. (Sciaretta 13:00.) The only indications of potential "coercion" prior to this initial consent are that Sciaretta had previously referenced the likelihood that a probation search would be authorized, (Sciaretta 5:36), and that Couture was on the phone with the probation office just before he requested consent, (Couture 00:01 to 00:24). Neither fact is sufficiently coercive as to make

14

Bradford's consent involuntary. Thus, the initial discovery of the drug paraphernalia was lawful.

Matters get a bit more complicated, however, as Bradford then withdrew his consent. (*See* Sciaretta 13:34.) At this point, Sciaretta invoked the parole officer's authorization of the search, (Sciaretta 13:34), which was affirmed by Couture, (Couture 2:06). However, Sciaretta shortly thereafter terminated his search of the vehicle and indicated that it was going to be seized. (Sciaretta 14:04.) The officers therefore did not rely on the probation officer's search authorization to further their search or discover the methamphetamine. To the contrary, Bradford insisted on speaking to Sciaretta after being handcuffed and placed in Couture's cruiser. (*See* Couture 3:29.) After he was *Mirandized*, Bradford volunteered that there was a pound of methamphetamine in the vehicle. (Doc. 24-1 at 5.) There is no evidence of coercion; Bradford had previous interactions with law enforcement, he was informed of his rights, he had only been detained briefly, and he specifically requested to speak to the officers. Thus, Bradford's voluntary consent once again underlies the discovery of the inculpatory evidence. *See Schneckloth*, 412 U.S. at 225 ("Is the confession the product of essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him.").

In light of Bradford's consent, the Court need not determine whether the probation search was lawfully authorized. This benefits the government, as the

Court did not find Thibodeau's testimony particularly credible and disagrees with the government that a parole violation of any kind gives rise to blanket reasonable suspicion to broadly search the residence, vehicle, or place of employment of a parolee. Rather, the Montana Supreme Court has held that a warrantless search under Montana's parole condition "is limited in scope to the reasonable suspicion that justified it in the first instance except to the extent that new or additional cause may arise within the lawful scope of the initial search." *See State v. Peoples*, 502 P.3d 129, 141 (Mont. 2022) (collecting cases). In the context of this case, the reasonable suspicion at issue was for two de minimis violations related to traffic safety and unauthorized travel. A search of Bradford's vehicle would not bear on either violation. In light of Bradford's consent, however, the Court does not reach this issue.

### CONCLUSION

Based on the foregoing, IT IS ORDERED that Bradford's motion to suppress (Doc. 23) is DENIED.

DATED this 23rd day of January, 2024.

11:30 A.M.

Donald W. Molloy, District Judge
United States District Court